ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of -- | ) |
| | ) |
| SYMVIONICS, Inc. | ) ASBCA Nos. 60335, 60612 |
| | ) |
| Under Contract No. N61340-12-D-5207 | ) |

APPEARANCE FOR THE APPELLANT:

Lars E. Anderson, Esq.
 Odin Feldman Pittleman PC
 Reston, VA

APPEARANCES FOR THE GOVERNMENT:

Ronald J. Borro, Esq.
 Navy Chief Trial Attorney
Matthew S. Hawkins, Esq.
Stephen L. Bacon, Esq.
 Trial Attorneys

OPINION BY ADMINISTRATIVE JUDGE SWEET ON
THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT

This is an appeal of the decision of the contracting officer (CO) to terminate a delivery order (DO) for default. SYMVIONICS, Inc. (Symvionics) and the government have cross-moved for summary judgment. Because there is no genuine issue of material fact as to whether there was an anticipatory repudiation of the DO, the government was justified in terminating for default. Therefore, we grant the government's motion for summary judgment, and deny Symvionics's cross-motion for summary judgment.

STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTIONS

*I. The Contract and the DO*

1. On 29 November 2011, the Naval Air Warfare Center Training Systems Division (NAWCTSD) awarded Symvionics Contract No. N61340-12-D-5207 (base contract). The base contract was a multiple award, indefinite-delivery/indefinite-quantity contract to provide a broad range of new training system products, or modifications to existing training systems. (R4, tab 1 at 1, 9)

2. The Naval Sea Systems Command (NAVSEA) operates Fire Fighting Trainers (FFTs) at various locations, including the naval facility at Great Lakes, Illinois (Great Lakes FFT) (R4, tab 4, attach. 1 at 1). The FFTs are computer-controlled, propane-fired simulators designed to realistically portray fires in different shipboard compartments. The Great Lakes FFT consists of eight different compartments—compartments 1 to 8—each of

which resembles a different shipboard compartment. The Great Lakes FFT also contains a staging area, and an adjacent area known as the pit. The Great Lakes FFT is located within Building 510. (R4, tab 4, attach. 2 at 3; supp. R4, tab 228 at 2-3, 5, 8)

3. In March 2015, NAVSEA identified a requirement to modernize the FFT control systems by installing Programmable Logic Controllers (PLCs) to operate the FFTs (R4, tab 4, attach. 2 at 1; supp. R4, tab 41 at 2849). At the time, the Great Lakes FFT was in "layup status," and had not been used to conduct training for years. Thus, before the PLCs could be installed, the Great Lakes FFT required hardware design and maintenance tasks for the non-PLC equipment affected by the layup. (Supp. R4, tab 31 at 4970)

4. Building 510 also needed repairs. Therefore, the government decided that NAWCTSD would execute a DO under the base contract for the repairs and upgrades to the FFTs—including the Great Lakes FFT—and the Naval Facilities Engineering Command (NAVFAC) would execute a separate contract to complete facility repairs to Building 510 (R4, tab 3 at 5; supp. R4, tab 31 at 4972).

5. On 12 February 2015, NAWCTSD sent base contract holders a competition assessment. The competition assessment alerted the base contract holders that NAWCTSD anticipated issuing a contract to upgrade FFTs, and that the Great Lakes FFT also would require hardware design for non-PLC equipment affected by the layup. The competition assessment stated:

*Estimated Milestones window for Great Lakes:*
| | |
|---|---|
| Fire Fighting training equipment removal for non-PLC upgrade tasks[:] | 18 Dec 2015 – 25 Jan 2016 |
| PLC and non-PLC Systems/Equipment Installation period[:] | 16 Jun – 5 Aug 2016 |
| System Integration, Testing & Acceptance[:] | 5 Aug – 28 Oct 2016 |
| Ready for Training[:] | 1 Nov 2016 |

(Supp. R4, tab 26 at 2407)[1] The competition assessment also contained a draft of appendix A, the final version of which is discussed in greater detail below (*id.* at 2477-90).

6. Symvionics's executive vice president Richard Weeks determined that Symvionics could perform the PLC upgrade work, but that it needed to subcontract out the non-PLC work, including the removal tasks. Mr. Weeks contacted Engineering Support Personnel, Inc. (ESP) about subcontracting. ESP expressed interest, but

---

[1] We refer to the period between 18 December 2015 and 25 January 2016 as "the removal period"; the period between 26 January 2016 and 15 June 2016 as "the interim period"; and the period between 16 June 2016 and 28 October 2016 as "the installation period." All dates are inclusive.

Symvionics and ESP never executed a subcontract. (Supp. R4, tabs 27-29; gov't mot., ex. 7, Weeks dep. at 42, 45-47, 51)

7. NAWCTSD held site visits at the FFTs in March and April 2015 (site visits) (supp. R4, tab 32 at 3483).[2] Symvionics sent Daniel Gustavsson to attend the site visits. No one from ESP attended. (Supp. R4, tab 41 at 2851-52)

8. During the site visits, Michael Fahnestock—NAWCTSD's program manager—provided a slide-show presentation. One of the slides stated that "[r]emarks and explanations at this conference will not qualify the terms of the solicitation. The terms of the solicitation and specifications will remain unchanged unless the solicitation is amended in writing." (Supp. R4, tab 36 at 11) Another slide contained the milestones from the competition assessment (*id.* at 9). Mr. Fahnestock informed the attendees "that contractors would not be able to have access to the [Great Lakes FFT]...between the removal and installation periods" (gov't mot., attach. 4, ¶ 8; *see also* gov't resp., ex. 1 at 60-61).

9. In his notes from the site visit, Mr. Gustavsson indicated that the milestones were "[h]ard dates due to mods by NAVFAC" (supp. R4, tab 38 at 2853). Mr. Gustavsson's notes also indicated that "[w]e have to remove the mock ups in several compartments and store them.... Compartments 1, 2, 3, 5." (*Id.* at 2856) Mr. Gustavsson testified that Mr. Fahnestock stated that NAVFAC had priority in compartments 1, 2, 3, and 5 (gov't reply br., ex. 4 at 102; app. opp'n, ex. D, ¶ 6).

10. Mr. Gustavsson also sent an email to Mr. Weeks stating that the Great Lakes FFT:

> [H]as hard dates to meet as there is going to be a separate contract through NAVFAC to mod the facility. This contract will be awarded first and our [Integrated Master Schedule (IMS)] will flow to the NAVFAC contractor, but they have very specific dates for install and testing that are levied on us.

(Supp. R4, tab 41 at 2850)

---

[2] NAWCTSD held a second set of site visits in July 2015, which Symvionics did not attend (supp. R4, tab 64 at 3319, tab 84 at 9). Because it does not appear that NAWCTSD provided any new, relevant information at the second set of site visits (gov't mot., ex. 3, ¶ 10), this opinion refers to the first set of site visits as the "site visits."

11. In a 3 April 2015 email to Mr. Weeks and Ray Moffitt — another Symvionics employee — Mr. Gustavsson provided his notes and thoughts on the site visits. He stated that:

> Bringing the trainer in Great Lakes back online will be an enormous task. While the government did give us a very long list of stuff we have to do, it is in no way complete.... When I talked to Bob [Graves] from ESP, he informed me that at one point, public works quoted $6 Million to do this and that was some time ago. We would also be required to work around a NAVFAC contractor and apparently, they seem to be getting priority. We get 6 weeks (over Christmas) to take out everything NAVFAC needs out of the way and then we have to be gone. We will not be allowed in the building during NAVFAC's upgrade. We then have to sit for 6 months and then re-install all of our new stuff and do the PLC upgrade in about 8 weeks and then jump into joint testing with the NAVFAC contractor.
>
> ....
>
> My feeling is that if we bid this honestly, we won['t be competitive price wise. If we get a winning price, it is 100% guaranteed we will be having lots and lots of fights with them about over and above costs.

(Supp. R4, tab 41 at 2849)

12. Following the site visits, Mr. Gustavsson submitted questions to NAWCTSD. He did not ask about whether contractors would have access to all Great Lakes FFT compartments during the interim period. (Supp. R4, tab 40)

13. On 21 April 2015, NAWCTSD issued RFP No. N61340-15-R-1113 (FFT solicitation) for a DO under the base contract to upgrade various FFTs, including the Great Lakes FFT (R4, tab 4).

14. The FFT solicitation contained the relevant milestones from the competition assessment and appendix A (R4, tab 4 at 21, 62-92).

15. Symvionics relied upon ESP to develop its proposal for the non-PLC work (gov't mot., ex. 7, Hallman dep. at 261-62, 302-03, Weeks dep. at 55; supp. R4, tab 32 at 1). Prior to the award of the DO, Symvionics and ESP did not discuss the project schedule, the milestones, or the statements regarding those milestones during the site

4

visits (gov't mot., ex. 7, Weeks dep. at 71, 106, 190, 192, Hallman dep. at 234, Polizzi dep. at 49-50).

16. On 25 September 2015, NAWCTSD awarded DO 0002 to Symvionics (supp. R4, tab 103).

17. Under the title "IMPORTANT PERFORMANCE DATES," DO 0002 section F.1 stated as follows:

The Contractor shall perform the events listed below during the specified timeframes:

| | |
|---|---|
| Fire Fighting training equipment removal for non-PLC upgrade tasks[:] | 18 Dec 2015 to 25 Jan 2016 |
| PLC and non-PLC Systems/Equipment Installation period[:] | 16 Jun 2016 to 14 Aug 2016 |
| System Integration, Testing, and Acceptance[:] | 15 Aug 2016 to 28 Oct 2016 |

....

| | |
|---|---|
| Delivery Date[:] | 1 Nov 2016 |

(R4, tab 11 at 21) We find that DO 0002 prohibited work during the interim period (26 January 2016 through 15 June 2016).

18. DO 0002 required Symvionics to provide an IMS "that presents the contractor's and subcontractor's plans and schedules to meet the requirements of the contract.... The contractor shall construct the IMS to ensure that the program milestones are met and to ensure that deliveries meet the requirements of the contract." (R4, tab 4, attach. 1 at 9) The IMS was due by 10 March 2015 (R4, tab 11 at 57).

19. The performance work statement stated that "[t]he reactivated [Great Lakes FFT] shall include upgrades and additional tasks to bring the trainer out of layup to a full operational status. The tasks in Appendix A are to assist with bringing the trainer out of layup. However, the list of tasks may not be all inclusive." (R4, tab 4, attach. 2 at 6)

20. Appendix A, which was entitled Great Lakes FFT "Reactivation Tasks," consisted of three tables (app. mot., ex. 2).

5

21. Appendix A's first table was entitled "Equipment Dismantle and Removal Matrix" (removal matrix). The removal matrix indicated in which compartments Symvionics and its subcontractor (collectively "team Symvionics") has to perform various equipment dismantle and removal tasks. In particular, the removal matrix required team Symvionics to perform the following tasks in all eight compartments and the pit:

(1) "Shut ball valve and disconnect propane piping downstream of all shutoff valves (Burner Control Assembly (BCA) side of the valve)"; and

(2) "Disconnect any power from all BCAs and burners[.]"

The removal matrix required team Symvionics to perform the following tasks in compartments 1, 2, 3, and 5:

(1) "Disconnect control wiring from all BCAs and burners";

(2) "Disconnect and remove air piping between the BCA's and burners";

(3) "Dismantle/remove/relocate burner equipment in crawl space";

(4) "Remove fire place mock-up in compartment"; and

(5) "Remove all Propane Sensor, Fog Distribution, and electrical distribution, enclosures and associated piping and conduit from the outside of the concrete wall between the BCA's and the fireplace."

A note following the removal matrix stated that "[t]hese tasks shall be completed during the predetermined firefighting trainer removal period to accommodate facility work conducted by NAVFAC." (App. mot., ex. 2 at 62)

22. Appendix A's second table was entitled "Equipment Install Matrix" (installation matrix). The installation matrix indicated in which compartments team Symvionics has to perform various installation tasks. In particular, the installation matrix required team Symvionics to perform the following tasks in all eight compartments and the pit:

(1) "Install new propane and air piping downstream of all valves and BCAs";

(2) "Install refurbished fire place burners in crawl spaces"; and

(3)    "Reinstall control wiring to fire place burners and BCAs[.]"

The installation matrix required team Symvionics to perform the following tasks in compartments 1, 2, 3, and 5:

(1)    "Install mock-up in compartment" and

(2)    "Reinstall all Propane Sensor, Fog Distribution, and electrical distribution, enclosures and associated piping and conduct from the outside of the concrete wall between the BCA's and the fireplace."

A note following the installation matrix stated that "[t]hese tasks shall be conducted during the predetermined systems/equipment installation period." (App. mot., ex. 2 at 62-63)

23. Appendix A's third table required Symvionics to perform various tasks (app. mot., ex. 2 at 63-96). Some of those tasks—such as "[d]isassemble and remove all fireplace propane piping, burner elements, pilot assemblies, agent sensor assemblies, framework, conduit, and mounting hardware"—were equipment dismantling and removal tasks (*id.* at 67). Other tasks—such as "[i]nstall ten (10) 214CUFT, 1.1% Propane Bottles to be used for zero and span gas for the internal calibration functions"—were installation tasks (*id.* at 63). It is less clear whether the remaining tasks—such as "[r]eplace the filter assemblies...associated with each of the nine FFT Propane Sensor Assemblies, with new filter assemblies"—were removal or installation tasks (*id.*).

*II. Performance*

24. Following the award of DO 0002, Donald Hallman—Symvionics's program manager—and Mr. Graves arranged a meeting on 15 October 2015 to prepare for the upcoming post award conference (PAC) (supp. R4, tab 108). In his email arranging the meeting, Mr. Hallman stated that:

> One of the items I want to work out is the schedule, specifically for ESP the dismantling and rebuild of [the Great Lakes FFT]. Currently our schedule only shows each as just one line (based on Govt dates). I would like to break that out into more detail. We don't have to identify every single action but I think we need to identify the major areas with timelines.

(Supp. R4, tab 107 at 2841)

25. In response to Symvionics's request, Mr. Graves sent Mr. Hallman a draft IMS. The draft IMS indicated that ESP would perform non-PLC installation tasks during the interim period. In particular, ESP indicated that it would "[i]nstall new

7

propane and air piping downstream of all valves and BCAs" and "[i]nstall refurbished fire place burners in crawl spaces" in the pit and compartments 4, 6, 7 and 8 during the interim period. The draft IMS highlighted those entries. Mr. Graves stated that "[t]he areas I have highlighted are questionable as [NAVFAC] may not allow us to work anywhere in the trainer during 1/25/16 and 6/15/16. It would not be good if that happens?" (Supp. R4, tab 119 at 2539, 2541-42)

26. On 14 October 2015, Mr. Graves called Mr. Hallman. Mr. Graves told Mr. Hallman that he had an informal meeting with NAVFAC. During that meeting, NAVFAC informed Mr. Graves that ESP would not have access to any Great Lakes FFT compartments during the interim period. (Supp. R4, tab 121 at 2191)

27. Mr. Hallman:

> [W]as a little surprised by this as I had interpreted that we would only have access during the [removal and installation periods]. I called Bob Graves on this and he stated that during the proposal [ESP] had assumed they could work in the spaces not needed by NAVFAC and in fact, could not meet their dates if they did not have that access.

(Supp. R4, tab 145 at 2838)

28. Mr. Hallman emailed Walter Kelly—his supervisor—and Symvionics's senior management. In that email, Mr. Hallman stated that:

> From the RFP it was very clear that we/ESP would be given access to the trainer from 12/18/15 to 1/25/16 to remove all non-PLC equipment in preparation for refurb. At that point the facility is turned over to [NAVFAC] for building mods and not returned to us until 6/15/16. From that point we have until 11/1/16 to complete RFT.
>
> I received a schedule from Bob Graves indicating that it will take them 7 months just to get the trainer to a state to start integration and test. Obviously big problem.
>
> It is clear that ESP was counting on getting access to the trainer when [NAVFAC] has it. Bob is claiming that he did not know the dates when they would have the trainer but they are clearly stated in the RFP.
>
> ....

8

So the issues are

1) Did ESP clearly know the dates that they would be given the trainer or did they know them and just glossed over them assuming that they would have access from 1/25 to 6/15

2) Assuming the Govt does not back off on allowing access we are going to need to hold ESP to the contractual dates.

(Supp. R4, tab 121 at 2191-92)

29. Mr. Kelly responded to Mr. Hallman by inquiring:

Did we know that ESP planned to work during that period or was that discovered after award[?] I think the contract excerpt...makes it clear that we would not have access and [at] a minimum, we (ESP) should have made it clear on the schedule impact if we did not have access between Jan and Jun.

(Supp. R4, tab 145 at 2837)

30. As agreed, Symvionics and ESP held a meeting on 15 October 2015 to prepare for the PAC presentation (PAC preparation meeting) (gov't mot., ex. 7, Graves dep. at 193). At the PAC preparation meeting, Mr. Graves raised the fact that NAVFAC informed him that team Symvionics would not have access to any Great Lakes FFT compartments during the interim period. Mr. Gustavsson responded, "[y]eah, I recall them saying that when we went to the industry day." (Gov't mot., ex. 9, Hallman dep. at 209) Nevertheless, when ESP indicated that it would "walk away from the contract" if it did not get access to some Great Lakes FFT compartments during the interim period, Symvionics and ESP "decided that we would go forward with the IMS as is, as if we had not been given this info[rmation]" that team Symvionics would not have access to any Great Lakes FFT compartments during the interim period (supp. R4, tab 145 at 2838-39).

31. On 15 October 2015, Mr. Graves sent John Russell—ESP's president—an email about the PAC preparation meeting. In the email, Mr. Graves stated that:

Symvionics found nothing in writing that we couldn't be in the other spaces during the four months in question and will present the IMS with [ESP] working those spaces and fight the fight. (They admit it was discussed in the meeting but never put in writing and we weren't told)[.]

9

(Supp. R4, tab 127 at 1)

32. On 20 October 2015, Symvionics, ESP, and NAWCTSD representatives attended the PAC (supp. R4, tab 166 at 1162, 1169). At the PAC, Mr. Hallman presented a draft IMS (October IMS) (*id.* at 40-48). The October IMS showed that team Symvionics would perform the "Install Non-PLC [Great Lakes FFT]" tasks during the interim period (*id.* at 43). In particular, the October IMS showed that team Symvionics would perform the following installation tasks during the interim period:

(1)     "Install new propane and air piping downstream of all valves and BCAs in the Pit and compartments 4,6,7 & 8";

(2)     "Install refurbished fire place burners in crawl spaces in the Pit and compartments 4,6,7 & 8"; and

(3)     "Reinstall control wiring to fire place burners and BCAs in the Pit and all compartments[.]"

(*Id.* at 43-44)[3]

33. The PAC minutes reflected that Ira Hutchinson—a government representative—"took issue with line item [23], Install Non-PLC [Great Lakes FFT]. Mr. Hutchinson stated that this timeframe is for the NAVFAC contractor and SYMVIONICS/ESP will not be allowed into the trainer during this time."[4] (Supp. R4, tab 166 at 1165) An internal draft of the PAC minutes generated by Symvionics indicated that Symvionics responded that:

> Although not specifically stated in the contract, SYMVIONICS/ESP wishes to share the spaces on a not to interfere basis for the purpose of the lengthy restoration process as to not impact schedule. Mr. Graves stated that the amount of work required to be performed will make it difficult to achieve the schedule without access during this timeframe.

---

[3] Under the October IMS, team Symvionics would perform the "[r]einstall control wiring to fire place burners and BCAs in the Pit and all compartments" task mostly during the installation period, and only for one day during the interim period. Team Symvionics would perform the other tasks listed above entirely during the interim period. (Supp. R4, tab 166 at 43-44)

[4] The minutes incorrectly referred to "Install Non-PLC [Great Lakes FFT]" as item 21 instead of item 23 (supp. R4, tab 166 at 1165).

10

(Supp. R4, tab 142 at 4) The final version of the minutes submitted to NAWCTSD omitted the phrase "Although not specifically stated in the contract" (*id.*; supp. R4, tab 166 at 1165). The parties agreed to table the discussion regarding the interim period until a NAVFAC Partnership Meeting (supp. R4, tab 166 at 1165).

34. On 29 October 2015, NAWCTSD sent Mr. Hallman an Outlook schedule invitation for a NAVFAC partnership meeting on 17 November 2015 (supp. R4, tab 160 at 3).

35. By email dated 29 October 2015, Mr. Hallman tentatively accepted the invitation. However, his email stated that "[a]t this point it is our position, based on the evaluation of alternatives with ESP, that without concurrent access to the trainer rooms not affected by the [NAVFAC] construction contractor from mid Jan 2016 to mid June 2016, the Program cannot be on schedule." (Supp. R4, tab 160 at 2)

36. On 3 November 2015, NAWCTSD and Symvionics held a conference call to discuss Symvionics's concerns regarding meeting the delivery dates. During that call, Mr. Hallman stated "that it was determined by ESP that the removal tasks could not be performed within the timeframe identified in" section F.1 without access to some Great Lakes FFT compartments during the interim period. (Supp. R4, tab 173 at 6649)

37. On 6 November 2015, Andrea Gordon-Eubanks—the contracting officer (CO)—sent Symvionics a notice to cure. The notice to cure stated that Symvionics repudiated the delivery date by, *inter alia*, indicating at the PAC, in the 29 October 2015 email, and during the 3 November 2015 conference call that it was not possible to achieve the delivery date without access to the Great Lakes FFT during the interim period. The notice to cure stated that, if Symvionics failed to cure by 16 November 2015, the government might terminate DO 0002 for default. (Supp. R4, tab 177 at 1-2)

38. On 11 November 2015, Mr. Hallman submitted Symvionics's final IMS (November IMS). The November IMS, showed that team Symvionics would perform the "Install Non-PLC [Great Lakes FFT]" tasks during the interim period. In particular, the November IMS showed that team Symvionics would perform the following installation tasks during the interim period:

(1)    "Install new propane and air piping downstream of all valves and BCAs in the Pit fir[e]places";

(2)    "Install new propane and air piping downstream of all valves and BCAs in compartment[] 4 fireplaces";

(3)    "Install new propane and air piping downstream of all valves and BCAs in compartment 6 fireplaces";

11

(4) "Install new propane and air piping downstream of all valves and BCAs in compartment 7 fireplaces";

(5) "Install new propane and air piping downstream of all valves and BCAs in compartment 8 fireplaces";

(6) "Remove, refurbish and reinstall fire place burners in crawl spaces in the Pit";

(7) "Remove, refurbish and reinstall fire place mockups and burners in compartment 4"; and

(8) "Reinstall control wiring to fire place burners and BCAs in the Pit and all compartments."

(Supp. R4, tab 192 at 4-6)[5]

39. On 16 November 2015, Symvionics sent the CO its response to the cure notice. Symvionics stated that the cure notice was based upon the false premise that DO 0002 prohibited any work on the Great Lakes FFT during the interim period. Nevertheless, Symvionics stated that it was "prepared to accommodate this material change to our Contract if so directed by the Contracting Officer." (Supp. R4, tab 206 at 1, 12) We find that this reply, coupled with the November IMS (which showed that Symvionics would perform work during the interim period) and the finding that no work was allowed during the interim period (SOF ¶ 17), evinced an intent to repudiate DO 0002.

40. On 18 November 2015, CO Gordon-Eubanks issued a notice of termination for default. The notice stated that Symvionics was in default because, *inter alia*, it repudiated the delivery date. (Supp. R4, tab 209 at 1)

## DECISION

*I. The Standards for Summary Judgment*

Summary judgment will be granted if a moving party has shown that there are no genuine issues of material fact and it is entitled to judgment as a matter of law. *Celotex*

---

[5] Under the November IMS, team Symvionics would perform the "[r]einstall control wiring to fire place burners and BCAs in the Pit and all compartments" task mostly during the installation period, and only for one day during the interim period. Team Symvionics would perform the other tasks listed above entirely during the interim period. (Supp. R4, tab 192 at 6)

*Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A non-movant seeking to defeat summary judgment by suggesting conflicting facts must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue of material fact arises when the non-movant presents sufficient evidence upon which a reasonable fact finder, drawing the requisite inferences and applying the applicable evidentiary standard, could decide the issue in favor of the non-movant. *C. Sanchez & Son, Inc. v. United States*, 6 F.3d 1539, 1541 (Fed. Cir. 1993). Thus, if the non-moving party carries the burden of proof at trial for elements of its case and fails to provide such proof, the moving party is entitled to summary judgment. *Dairyland Power Coop. v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994). In deciding summary judgment motions, we do not resolve controversies, weigh evidence, or make credibility determinations. *Liberty Lobby*, 477 U.S. at 255. Moreover, we draw all reasonable inferences in favor of the non-movant. *Id.*

## II. The Default Termination Was Justified

### A. Symvionics Repudiated DO 0002

The government is entitled to judgement as a matter of law because there is no genuine issue of material fact suggesting that the default termination was unjustified. The government must prove that a default termination was justified. *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed. Cir. 1987). "We may sustain a default termination on any proper ground, even if that ground was not the one relied upon by the Government." *Jones Oil Co.*, ASBCA No. 42651 *et al.*, 98-1 BCA ¶ 29,691 at 147,150 (citing *Kelso v. Kirk Bros. Mechanical Contractors, Inc.*, 16 F.3d 1173, 1176 (Fed. Cir. 1994)); *James B. Beard*, ASBCA Nos. 42677, 42678, 93-3 BCA ¶ 25,976 at 129,171.

One ground for sustaining a default termination is anticipatory repudiation. In order to establish anticipatory repudiation, the government must show that a contractor communicated an intent not to perform in a positive, definite, unconditional and unequivocal manner. *James B. Beard*, 93-3 BCA ¶ 25,976 at 129,171. Either an express refusal to perform, or a statement of an inability to perform may constitute anticipatory repudiation. JOHN CIBINIC, JR., JAMES F. NAGLE, AND RALPH C. NASH, JR., ADMINISTRATION OF GOVERNMENT CONTRACTS, 837-41 (5th ed. 2016). In particular, a statement that a contractor is unable to perform unless the government modifies a contract constitutes anticipatory repudiation. *Cascade Pacific International v. United States*, 773 F.2d 287, 293 (Fed. Cir. 1985); *Tacoma Boatbuilding Co.*, ASBCA No. 50238, 00-1 BCA ¶ 30,590 at 151,068-69.

Here, we conclude that there is no genuine issue of material fact as to whether Symvionics positively, definitively, unconditionally, and unequivocally stated to NAWCTSD that it was unable to perform unless it was given access to some Great Lakes FFT compartments during the interim period (SOF ¶ 39). In the 29 October 2015 email, Mr. Hallman stated that "without concurrent access to the trainer rooms

13

not affected by the [NAVFAC] construction contractor from mid Jan 2016 to mid June 2016, *the Program cannot be on schedule*" (SOF ¶ 35 (emphasis added)). Likewise, during the 3 November 2015 conference call, Mr. Hallman stated that "the removal tasks *could not be performed* within the timeframe identified in" section F.1 without access to some Great Lakes FFT compartments during the interim period (SOF ¶ 36 (emphasis added)).

Moreover, there is no genuine issue of material fact as to whether the condition that team Symvionics have access to some Great Lakes FFT compartments during the interim period would modify DO 0002's requirements. In determining what a contract requires, "clear and unambiguous [contract provisions] must be given their plain and ordinary meaning, and we may not resort to extrinsic evidence to interpret them." *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1040 (Fed. Cir. 2003) (en banc). In determining the plain and ordinary meaning of language, we do not look only at the individual words used, but also the context and the words' place in the overall contractual scheme. *See ClearCorrect Operating, LLC v. ITC*, 810 F.3d 1283, 1290 (Fed. Cir. 2015). One cannon of construction that we use to determine the meaning of language is *expressio unius est exclusio alterius*, which means "the expression of one thing is the exclusion of another." *Cook v. Principi*, 318 F.3d 1334, 1339 n.8 (Fed. Cir. 2002); *ITT Defense Communications Division*, ASBCA No. 44791, 98-1 BCA ¶ 29,590 at 146,703-04.

"An ambiguity exists when a contract is susceptible to more than one reasonable interpretation." *E.L. Hamm & Assocs., Inc. v. England*, 379 F.3d 1334, 1341 (Fed. Cir. 2004). As we have held:

> Determining whether...differing interpretations are reasonable begins with an examination of the plain language of the contract, construing the contract so as to effectuate its spirit and purpose giving reasonable meaning to all parts of the contract. In order to fall within the zone of reasonableness, a party's interpretation must be logically consistent with the contract and the parties' objectively ascertainable intentions.

*ECCI-C Metag, JV*, ASBCA No. 59031, 15-1 BCA ¶ 36,145 at 176,418 (citations and quotations omitted).

Here, the wording of section F.1 does not state that team Symvionics would have access to the Great Lakes FFT during the interim period (SOF ¶ 17). Nor does the explicit wording state that team Symvionics would not have access to the Great Lakes FFT during the interim period (*id.*). Rather, both parties rely upon the *expressio unius* cannon of construction. The government's position is that the inclusion of periods during which team Symvionics had to perform excluded team Symvionics

14

from performing during other periods. That is a reasonable interpretation under the *expressio unius* cannon of construction.

Symvionics's argument is more complex. Symvionics argues that, reading section F.1 in conjunction with appendix A, appendix A's removal matrix lists the removal tasks that section F.1 required team Symvionics to perform during the removal period. Likewise, Symvionics argues that appendix A's installation matrix listed the installation tasks that section F.1 required team Symvionics to perform during the installation period. Symvionics argues that that leaves tasks in appendix A's third table, which included refurbish tasks. Symvionics argues that the inclusions of time-frames for some tasks excludes time-frames for other tasks. Furthermore, Symvionics argues that, by only requiring team Symvionics to perform the removal and installation tasks in compartments 1, 2, 3, and 5 during the removal and installation periods, appendix A's removal and installation matrices did not impose a limitation upon when team Symvionics could perform the removal and installation tasks in the other compartments (i.e., compartments 4, 6, 7, and 8) and the pit.

While Symvionics's interpretation appears to fall within the zone of reasonableness, it proves too much. If Symvionics were correct that section F.1 only required team Symvionics to perform the removal and installation tasks enumerated in appendix A's removal and installation matrices during the removal and installation periods, the October and November IMSs still would have contained a schedule that violated section F.1. The installation matrix required team Symvionics to install propane and air piping, fire place burners, and control wiring *in all compartments* during the installation period (SOF ¶ 22). However, under both the October and November IMSs, team Symvionics would perform at least some of those tasks in some Great Lakes FFT compartments during the interim period (SOF ¶¶ 32, 38). Therefore, even under Symvionics's reading of DO 0002, its IMSs still proposed schedules that violated section F.1.

More importantly—assuming DO 0002 was ambiguous—Symvionics was bound by the government's reasonable interpretation of DO 0002 as prohibiting access to any Great Lakes FFT compartments during the interim period. "[A] party that enters without objection into a contract with knowledge of the other party's reasonable interpretation is bound by that reasonable interpretation." *HPI/GSA-3C, LLC v. Perry*, 364 F.3d 1327, 1335 (Fed. Cir. 2004); *see also Space Gateway Support, LLC*, ASBCA Nos. 55608, 55658, 13 BCA ¶ 35,232 at 172,957 ("A party who willingly, and without protest, enters into a contract with actual or imputed knowledge of the other's interpretation of it is bound by such interpretation and cannot later claim that it thought something else was meant.").

Here, there is no genuine issue of material fact as to whether Symvionics knew that NAWCTSD interpreted DO 0002 as prohibiting access to any Great Lakes FFT

compartments during the interim period.[6] NAWCTSD's Mr. Fahnestock informed Symvionics during the site visits that "contractors would not be able to have access to the [Great Lakes FFT]...between the removal and installation periods" (SOF ¶ 8). In a 3 April 2015 email summarizing the site visits, Symvionics's Mr. Gustavsson reported that:

> We get 6 weeks (over Christmas) to take out everything
> NAVFAC needs out of the way and then *we have to be*
> *gone. We will not be allowed in the building during*
> *NAVFAC's upgrades.* We then have to sit for 6 months
> and then re-install all of our new stuff and do the PLC
> upgrade in about 8 weeks[.]

(SOF ¶ 11) (emphasis added).[7] Again, at the PAC preparation meeting, Mr. Gustavsson reported that he recalled Mr. Fahnestock saying that contractors would not have access to any Great Lakes FFT compartments during the interim period (SOF ¶ 30). Indeed, in the 15 October 2015 internal email discussing the PAC preparation meeting, ESP acknowledged that Symvionics admitted that the government discussed the prohibition on accessing any Great Lakes FFT compartments during the interim period (SOF ¶ 31).

Moreover, as discussed above, NAWCTSD's interpretation of DO 0002 as prohibiting access to any Great Lakes FFT compartments during the interim period was reasonable. Further, Symvionics entered into DO 0002 without objecting to NAWCTSD's interpretation (SOF ¶ 12). Therefore, Symvionics was bound by NAWCTSD's reasonable interpretation of DO 0002 as prohibiting access to any Great Lakes FFT compartments during the interim period. *HPI/GSA-3C*, 364 F.3d at 1335. Because team Symvionics was prohibited from accessing any Great Lakes FFT compartments during the interim period, its statements that performance absent such

---

[6] That Mr. Fahnestock may have stated that the mock ups had to be removed from compartments 1, 2, 3, and 5, and that the NAVFAC contractor would have priority in those compartments during the interim period does not negate the fact that he also stated that team Symvionics would not have access to any Great Lakes FFT compartments during the interim period (SOF ¶ 9).

[7] Addressing the 3 April 2015 email, Symvionics argues that the word "we" referred to Symvionics, and not ESP. That interpretation is not reasonable. Because ESP was the entity that was to perform the removal tasks (SOF ¶ 6), it was the only entity to which Mr. Gustavsson could have been referring when he said "[w]e get 6 weeks (over Christmas) to take out everything NAVFAC needs out of the way and then we have to be gone" (SOF ¶ 11).

access was impossible conditioned performance on a modification to DO 0002, and thus those statements constituted anticipatory repudiation.

Symvionics argues that NAWCTSD's statements at the site visits could not change the terms of DO 0002 because a slide presented during the site visits stated that "[r]emarks and explanations at this conference will not qualify the terms of the solicitation. The terms of the solicitation and specifications will remain unchanged unless the solicitation is amended in writing." (SOF ¶ 8) That argument is irrelevant. The issue here is not whether NAWCTSD's oral statements at the site visits qualified or changed the terms of DO 0002. Rather, the issue is what the ambiguous terms of DO 0002 meant in the first place. In addressing that later question, it is appropriate to consider whether one party knows of — and fails to object to — the other party's reasonable interpretation of the ambiguous terms. *HPI/GSA-3C*, 364 F.3d at 1335.

Likewise, FAR 14.207 does not support Symvionics's argument. FAR 14.207 provides that a pre-bid conference "shall never be used as a substitute for amending a defective or ambiguous invitation." As discussed above, NAWCTSD did not seek to use the pre-bid conference as a substitute for amending a solicitation that it knew was ambiguous. Rather, it offered its interpretation of the meaning of language in section F.1 (SOF ¶ 8). Because Symvionics failed to question, or object to, that interpretation, NAWCTSD had no notice that Symvionics held a different interpretation that rendered the language ambiguous (SOF ¶ 12).

*B. Symvionics Did Not Provide Adequate Assurances*

Symvionics also argues that its response to the notice to cure provided adequate assurances that it would perform. That argument is meritless. A "vague and largely unsubstantiated" response to a notice to cure is insufficient to adequately assure an agency. *DODS, Inc.*, ASBCA Nos. 57746, 58252, 14-1 BCA ¶ 35,677 at 174,626. Rather, once the government issues a cure notice, "[t]he burden is then on the contractor to advise the Government *how* it will complete the project on time, according to contract requirements." *McDonnell Douglas Corp. v. United States*, 567 F.3d 1340, 1350 (Fed. Cir. 2009) (quoting *Universal Fiberglass Corp.*, 537 F.2d 393 419 (Ct. Cl. 1976)) (emphasis added).

Here, Symvionics's response to the notice to cure merely stated that it was "prepared to accommodate this material change to our Contract if so directed by the Contracting Officer" (SOF ¶ 39). That vague and unsubstantiated statement does not raise a genuine issue of material fact suggesting that Symvionics provided adequate assurances because that statement provided no advice on how—despite its earlier protestations of impossibility—Symvionics would complete the project on time, and according to contract requirements (*id.*). Moreover, the implication from this response is that Symvionics viewed the government's reasonable interpretation of the delivery

order as a "material change" (which would have the potential of schedule impact and/or monetary consequences).

Nor does *Fairfield Scientific Corp.*, ASBCA No. 21151, 78-1 BCA ¶ 13,082 at 63,908, help Symvionics. In *Fairfield Scientific*, we held that "there is no anticipatory breach where the professed inability to perform can be overcome and the contractor expresses a willingness to continue performance." *Id.* As discussed above, while the response to the notice to cure expressed a willingness to continue performance, it offered no evidence that Symvionics's professed inability to perform could be overcome (SOF ¶ 39). Therefore, the response to the notice to cure did not provide adequate assurance as a matter of law.

## CONCLUSION

The government's motion for summary judgment is granted. Symvionics's cross-motion for summary judgment is denied. Judgment is entered in the government's favor, and the appeals are denied.

Dated: 26 June 2017

JAMES R. SWEET
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Acting Vice Chairman
Armed Services Board
of Contract Appeals

18

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 60335, 60612, Appeals of SYMVIONICS, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

19