**HPI/GSA–3C, LLC, Appellant,**

v.

**Stephen A. PERRY, Administrator, General Services Administration, Appellee.**

**No. 03–1252.**

United States Court of Appeals, Federal Circuit.

DECIDED: April 12, 2004.

Justice, of Washington, DC, argued for appellee. With her on the brief were Peter D. Keisler, Assistant Attorney General; and David M. Cohen, Director. Of counsel on the brief was David M. Smith, Attorney, Office of General Counsel, General Services Administration, of Washington, DC.

Before NEWMAN, GAJARSA, and LINN, Circuit Judges.

Opinion of the court filed by Circuit Judge GAJARSA. Opinion concurring–in–part and dissenting–in–part filed by Circuit Judge LINN.

Opinion for the court filed by Circuit Judge GAJARSA.

HPI/GSA–3C, LLC ("HPI"), appeals from the decision of the General Services Administration Board of Contract Appeals ("Board") finding: (1) that the term "zone" in the contract between HPI and the General Services Administration ("GSA") was ambiguous; (2) that HPI's interpretation of the term was unreasonable; and (3) that GSA's interpretation of the provision was reasonable and therefore controlling. *HPI/GSA–3C, LLC v. Gen. Servs. Admin.*, 03–1 B.C.A. (CCH) 32,101, 2002 WL 31608249 (GSBCA Nov. 20, 2002). Because we are unable to uphold the Board's decision on the reasoning provided, we vacate-in-part the Board's decision and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

### A. *Lease Negotiations Between GSA and Golub*

GSA issued a solicitation for offers ("SFO") in July of 1996, seeking to lease 348,660 square feet of building space in Kansas City, Missouri, for a period of 10 years. Pursuant to the SFO, all utilities were to be included in any offered rental

Thomas P. McLish, Akin Gump Strauss Hauer & Feld, LLP, of Washington, DC, argued for appellant. The briefs were submitted by Scott M. Heimberg for the appellant.

Jane W. Vanneman, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of

rates except for overtime heating and cooling costs, which were to be billed separately at an hourly rate to be negotiated. Paragraph 6.6(e), which was included in the SFO as originally issued, is at the center of the parties' disagreement and provides:

> Zone Control: Individual thermostat control shall be provided for office space with control areas not to exceed 2000 occupiable square feet. Areas which routinely have extended hours of operation shall be environmentally controlled through dedicated heating and air conditioning equipment. Special purpose areas ... with internal cooling load in excess of 5 tons shall be independently controlled.

This paragraph is standard in all GSA leases.

Golub and Company ("Golub") submitted its initial offer to GSA on October 10, 1996.[1] Golub proposed to construct a new six-story building for the lease, with a flat hourly overtime heating and cooling rate of $45 per hour. Golub's lease negotiator on the project was Mr. James Wieger ("Wieger"). Prior to entering private industry as a lease negotiator, Wieger worked for GSA as a special assistant to the Commissioner of GSA's Public Building Service.

During negotiations, Wieger and Ms. Cindy Jackson–Kiley ("Jackson–Kiley"), GSA's negotiator, discussed various requirements of the SFO, including the Government's goals regarding overtime heating and cooling. Jackson–Kiley explained to Wieger that the Government required an efficient heating, ventilation, and air conditioning ("HVAC") system that could be operated during overtime hours to provide heating and cooling only to those areas where needed, rather than servicing the entire facility. Based on a comparison of overtime heating and cooling costs for other leases in the Kansas City area, GSA had a target rate for overtime services for the entire building of between $40 and $75 per hour. At $45, Golub's rate was within GSA's target zone.

Following her initial meeting with Wieger, Jackson–Kiley issued an amendment to the SFO ("SFO Amendment"). In the SFO Amendment, Jackson–Kiley requested offerors to provide an additional breakdown of overtime heating and cooling costs, based on the cost per "zone." The amendment stated:

> Provide an hourly overtime rate for the following:
>
> Base or Minimum Hourly Charge ——
>
> Cost per Zone ——
>
> Hourly calculation: Number of zones needed by tenant, times hourly charge per zone, plus base or minimum hourly charge = total hourly charge.

At the time Jackson–Kiley issued the amendment, the HVAC system had not yet been designed. Consequently, she did not have a clear concept of the square footage covered by a "zone," but associated the term with the central HVAC equipment that would run to provide overtime services. *HPI/GSA–3C,* 03–1 B.C.A. (CCH) at 158,676. Wieger, however, recognized the amendment as an opportunity to increase Golub's profits on the lease without reducing the chances of winning the contract.[2] *Id.* His response to the SFO Amendment proposed a $120 base rate and a $40 hourly cost per zone for overtime heating and cooling. Wieger did not ex-

---

1. Golub was the original offeror and also signed the lease. Appellant HPI purchased Golub in October of 2000, and assumed the lease through a novation.

2. Wieger knew that overtime heating and cooling costs were not an evaluation factor in making the award, as the SFO expressly provided.

plain to GSA that his quoted rates equated a "zone" with the thermostat-controlled 2,000 square foot area described in paragraph 6.6(e) of the SFO. Based on the square footage in the building, Wieger estimated to himself that the final HVAC design for the building would contain approximately 175 "zones."[3] *Id.*

During a second round of negotiations, Jackson–Kiley repeated to Wieger that the purpose and intent of the zone formula was to enable the Government to pay for only the equipment required to be turned on during any overtime heating or cooling period. Wieger informed her that such a system was possible, but again avoided clearly explaining his interpretation of "zone" under the formula contained in the SFO Amendment. Upon completing negotiations, Golub submitted its final offer with an annual rental rate of $5,495,017 and a revised overtime heating and cooling rate of $80 per hour base cost and a cost per zone of $40. The Government accepted Golub's offer on May 29, 1997.

The parties signed the final lease documents in April of 1998. The signed documents included paragraph 6.6(e) of the original SFO and incorporated the formula for overtime heating and cooling services contained in the SFO Amendment. Since the building was not designed at the time the parties entered into the lease, the parties agreed to establish the actual lease dates by supplemental lease agreement upon delivery of the space, which was to be within 810 days following the Government's approval of final construction drawings.

## B. *The Final HVAC Design*

The final HVAC design for the Kansas City building utilizes three water-cooled centrifugal chillers of 350 tons each. Each chiller is independently sufficient to ser-

vice the building at the reduced levels of projected overtime loads. Two air-handling units, each consisting of two supply fans, deliver cooled air from the chillers into the building. The HVAC system delivers air into the individual areas of the building through the use of variable air volume ("VAV") boxes, which, as their name suggests, vary the volume of air delivered into a space through the use of dampers that open and close in response to a computer-generated temperature signal. A building automated control ("BAC") system generates the VAV-box control signal in response to inputs from a total of 366 thermostats (up from the 175 thermostats originally estimated by Wieger) throughout the building, and also controls the operation of the chillers and the air-handling units. Although the BAC controls each VAV box independently, if overtime heating or cooling is requested for any amount of space in the building, the BAC system must operate the chillers and air-handling units at a level sufficient to cool at least one-half of one floor (approximately 25,000 square feet).

## C. *The Disputed Lease Term*

In June of 2000, upon completion of the construction of the building, the United States Department of Agriculture ("USDA") (the building's actual tenant) requested overtime cooling to accommodate its move into the building. Following the move-in, Golub, through Wieger, submitted an invoice for overtime usage to the Government in the amount of $151,200. The invoice reflected Wieger's interpretation of the formula in the SFO Amendment, equating one zone to each of the building's 366 thermostats. According to Wieger, he "probably" determined the number of zones used by the USDA by

---

**3.** Paragraph 6.6(e) does not define "zones," but is entitled "zone control," which refer- ences zones but not without substantial ambiguity as to its meaning.

having an engineer count "on the basis of the sensors," only some of which were activated during the USDA's move into the building. A subsequent invoice for overtime HVAC use during the month of August for $184,320 reflected the same method of calculation.

Following receipt of the first invoice, the contracting officer overseeing administration of the lease, Ms. Patty Comstock ("Comstock"), rejected the amount of the charges. Under Golub's interpretation, Comstock noted, the cost of supplying overtime HVAC to all 366 thermostats of the building for a 48-hour overtime period would be $2,108,160—38% of the annual rental rate for the first year. Since a single fan in one of the air-handling units was sufficient to supply the building with cooling at the reduced overtime levels, Comstock concluded that each air-supply fan corresponded to a "zone." Under Comstock's interpretation, the $40 zone charge was a one-time cost per occurrence of overtime HVAC. Assuming that only one zone was used during the overtime period, Comstock recalculated the total overtime charges at $4000.[4]

Appellant HPI acquired Golub in October of 2000 and inherited the dispute. HPI submitted a certified claim to GSA for overtime HVAC, which GSA rejected over HPI's interpretation of "zone" as used in the SFO Amendment. GSA disagreed with HPI's assertion that paragraph 6.6(e) of the SFO provided a definition of "zone," explaining instead that the paragraph only

"specifie[d] the method for controlling temperature conditions by subdividing the building areas into smaller spaces, each having its own thermostat control." The rate for overtime HVAC services that HPI was charging the Government based on the submitted invoices, GSA noted, was $2057.61 per hour, which greatly exceeded the actual hourly cost of $11.60 estimated by the local utility. GSA's final decision defined a "zone" as an air-handling unit, yielding a maximum of two zones in the building.[5] HPI appealed the decision to the Board.

### D. The Board Proceeding

The Board concluded that the term "zone" was ambiguous as used in the lease. *HPI/GSA-3C*, 03-1 B.C.A. (CCH) at 158,-683–84. Although paragraph 6.6(e) was entitled "zone control" and the SFO Amendment included a formula referencing "zones," the Board explained, neither provision provided a definition of the term. The Board further found that the term did not have an accepted definition in the HVAC industry, citing an industry handbook and the testimony of technical witnesses presented during the proceeding. *Id.* at 158,683.

The Board next found HPI's equating of "zone" to "thermostat" unreasonable, as it would result in an *hourly* cost to the Government of 45% of the *daily* rental rate for the building, assuming overtime HVAC use in all 366 of HPI's "zones." *Id.* at 158,684. "If the contracting officer had

---

4. Comstock assumed that the move in occurred in four separate twelve-hour periods. For each twelve-hour period, Comstock multiplied the $80 per hour base rate by twelve hours, to obtain $960. Then, assuming one "zone," Comstock multiplied the $40 zone charge by one "zone," and added the resulting $40 amount to the previously calculated $960 to obtain a total charge for each twelve-hour period of $1000. The sum for the four twelve-hour periods totals $4000.

5. GSA's interpretation of a "zone" as an *air-handling unit* (with a maximum of two zones) in its rejection of HPI's certified claim appears to be different from Comstock's interpretation in the initial rejection, which equates a "zone" with a *supply air fan* (with a maximum of four zones). The Board did not address this inconsistency in its opinion.

agreed to such a seemingly imprudent bargain," the Board explained, "we would have expected it to be absolutely clear in the lease negotiation records. . . ." *Id.* The Board faulted Wieger's failure to clarify— and his deliberate avoidance of—the meaning of "zone."[6] The Board rejected HPI's argument that the doctrine of *contra proferentem*, which requires construing ambiguous terms against the drafter, required construing the ambiguity against the Government in this case, both because HPI's interpretation was unreasonable and the SFO Amendment was negotiated.

The Board found the Government's interpretation, on the other hand, reasonable as consistent with both the "Zone Control" provision in paragraph 6.6(e) and the Government's stated intent and purpose of efficiency underlying the SFO Amendment. *Id.* at 158,686. The Government's interpretation, the Board explained, was also consistent with the construction of the HVAC system, which required treatment of a minimum of 25,000 square feet of space if any space was to receive overtime HVAC. The Board concluded:

> [g]iven the flexibility of the system's design, it makes little sense to define the term "zone" in terms of a set amount of space and makes much more sense to define "zone" as the Government does, i.e., the amount of space served by the air handling units when delivering overtime HVAC.

*Id.*

Finally, the Board rejected the Government's interpretation of the zone charge of $40 as a single, rather than an hourly,

charge. *Id.* HPI timely appealed, and we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(10).

## II. DISCUSSION

### A. *Standard of Review*

■■■ We review an agency board's decision under the standard set out in the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613 ("CDA"). Under the CDA, a Board's conclusions of law are reviewed without deference. 41 U.S.C. § 609(b); *White v. Edsall Constr. Co.*, 296 F.3d 1081, 1084 (Fed.Cir.2002). The agency board, however, "has considerable experience and expertise in interpreting Government contracts, and its interpretation is given careful consideration and great respect." *Cmty. Heating & Plumbing Co. v. Kelso*, 987 F.2d 1575, 1579 (Fed.Cir.1993). An agency board's findings of fact shall not be set aside unless "fraudulent, or arbitrary, or capricious, or so grossly erroneous as to necessarily imply bad faith, or if such decision is not supported by substantial evidence." 41 U.S.C. § 609(b). The sole issue here is one of contract interpretation, which is a question of law reviewed de novo. *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 997 (Fed.Cir.1996).

### B. *Analysis*

As an initial matter, neither party disputed the Board's determination that the $40 zone charge in the formula contained in the SFO Amendment was intended by the parties to be an hourly charge per zone

---

**6.** When asked during the Board proceedings why he failed to clarify the term "zone" in his first meeting with Jackson–Kiley, Wieger responded:

> I don't like roiling new clients with a bunch of questions that are like, sound like a lawyer, you know. I usually just answer the question, try to be a team player. I had my architect there and the [general contractor]

> there, and our goal is to make her think that we're going to work with her in a positive team fashion.

When further questioned about his failure to clarify the overtime provisions during the second in-person negotiation session, he explained: "I try not to ask these really harsh, legal-type boxing questions, because sometimes it's not to my advantage."

rather than a one-time charge per occurrence as stated by the CO. *HPI/GSA–3C*, 2003–1 B.C.A. (CCH) at 158,686. Accordingly, this conclusion by the Board remains undisturbed on remand.

▮ HPI challenges the Board's finding of ambiguity and, in the alternative, the Board's determination that its interpretation was unreasonable. We reject HPI's arguments and agree with the Board that the term "zone" is ambiguous. Although paragraph 6.6(e) discusses "zone control" and the formula in the SFO Amendment depends in part on the number of "zones" in the building, neither provision defines the term nor is a meaning otherwise discernible from the lease documents. When a contract term is susceptible to more than one reasonable interpretation, it is ambiguous. *Jowett, Inc. v. United States,* 234 F.3d 1365, 1368 (Fed. Cir.2000). In light of the ambiguity and the arguments made by the parties, the Board properly received evidence of trade practice and custom in an attempt to resolve the ambiguity. *See Metric Constructors, Inc. v. NASA,* 169 F.3d 747, 753 (Fed.Cir.1999); *Jowett,* 234 F.3d at 1370 n. 3. Expert testimony presented by the parties and found credible by the Board, however, revealed further uncertainty in the industry on the meaning of the term. Varying interpretations of "zone" were also reflected in several industry handbooks reviewed by the Board. The ambiguity in the language of the lease documents combined with the disagreement between the parties, the experts, and the industry handbooks confirms our conclusion that the Board was correct in finding the term "zone" ambiguous.

▮ Our precedent provides us with several legal rules for choosing between competing interpretations of an ambiguous contract provision. The general rule is *contra proferentem,* which requires ambiguities in a document to be resolved against the drafter. *Hills Materials Co. v. Rice,* 982 F.2d 514, 516 (Fed.Cir.1992). The patent ambiguity doctrine, however, is an exception to the general rule that requires construing ambiguities against the contractor where the ambiguities are "so 'patent and glaring' that it is unreasonable for a contractor not to discover and inquire about them." *Triax Pac. v. West,* 130 F.3d 1469, 1474–75 (Fed.Cir.1997) (quoting *Beacon Constr. Co. v. United States,* 161 Ct.Cl. 1, 314 F.2d 501, 504 (1963)). As this court explained in *Triax,* "[t]he patent ambiguity doctrine is a court-made rule that is designed to ensure, to the greatest extent possible, that all parties bidding on a contract share a common understanding of the scope of the project." *Id.* at 1475. Where an ambiguity is not sufficiently glaring to trigger the patent ambiguity exception, it is deemed latent and the general rule of *contra proferentem* applies. *Id.*

▮ Before a court may enforce the general rule of *contra proferentem* against the drafter of an ambiguity, the contractor's interpretation of that ambiguity must be reasonable. *Hills Materials,* 982 F.2d at 516. Although the reasonableness requirement operates in the same manner as the patent ambiguity exception by defeating the operation of the general rule of *contra proferentem,* the requirement is not so much an exception to the rule as it is an inherent component of the rule itself. As explained by our predecessor, the Court of Claims:

> The essential ingredients of the rule are: (1) that the contract specifications were drawn by the Government; (2) that language was used therein which is susceptible of more than one interpretation; (3) that the intention of the parties does not otherwise appear; and (4) that the contractor *actually and reasonably construed the specifications* in accordance with one of the meanings of which the language was susceptible.

*W. Contracting Corp. v. United States,* 144 Ct.Cl. 318, 326 (1958) (emphasis added). Therefore, apart from the patent ambiguity exception, a contractor must satisfy the above conditions before the general rule of *contra proferentem* will apply.[7]

▮▮▮ Despite the Government's argument to the contrary, the ambiguity in the lease documents between HPI and the Government is not sufficiently glaring to trigger the patent ambiguity doctrine. The remaining question is whether the general rule of *contra proferentem* requires us to construe the ambiguity against GSA. Although not specifically addressed, the Board's opinion establishes, and we agree, that the first three elements of the rule are satisfied. We are unable to discern from the Board's opinion, however, whether the fourth element has also been met.

▮▮▮ The Board found HPI's interpretation of "zone" unreasonable, meaning that the fourth element of the rule was not satisfied and, which, if correct, precludes application of the general rule of *contra proferentem. HPI/GSA-3C,* 2003–1 B.C.A. (CCH) at 158,684–85. The Board, however, does not explain why HPI's interpretation of the term is unreasonable. Several themes emerge in the Board's analysis of HPI's proffered interpretation of the term "zone" that must be analyzed. The first theme apparent in the Board's opinion is that HPI's interpretation of "zone" results in significant added costs to the Government under the lease. *Id.* at 158,684. HPI is correct in arguing that unfavorable financial consequences alone are insufficient to render a particular con-

tractual interpretation unreasonable. Resolution of an ambiguity in contractual language by a court will always result in unfavorable financial consequences to at least one of the parties to the dispute. Without more, the added costs to the Government under HPI's interpretation of the term "zone" do not make that interpretation unreasonable.

The second theme that emerges in the Board's opinion, however, is that HPI's predecessor company, Golub, through Wieger, had knowledge of the Government's understanding of the "zone" when the contract was formed. *HPI/GSA-3C,* 2003–1 B.C.A. (CCH) at 158,684–85. The Board cites *Perry & Wallis, Inc. v. United States,* 192 Ct.Cl. 310, 427 F.2d 722 (1970), for the proposition that a party that enters without objection into a contract with knowledge of the other party's reasonable interpretation is bound by that reasonable interpretation. While this is an unassailable rule of contract law, we are unclear on precisely how the Board applied it here.

*Perry & Wallis* involved a dispute between a contractor and the Government over the amount of an equitable adjustment provided by contract following a change by the Government to the contractor's work requirements. 427 F.2d at 724. The contracting officer rejected the contractor's position that the equitable adjustment clause in the contract included allowances for the contractor's overhead and profit. The contracting officer permitted adjustment for the contractor's base costs of labor, materials, supplies, plus an additional 15 percent. *Id.* The Court of Claims agreed with the interpretation of the contracting officer. Although it found the

---

7. The requirement in our precedent that a contractor must have relied on its interpretation when submitting its bid, *see, e.g., Edward R. Marden Corp. v. United States,* 803 F.2d 701, 705 (Fed.Cir.1986), derives from the fourth *Western Contracting* requirement: that

a contractor *actually* construed the language in accordance with one of the meanings of which the language was susceptible. *See WPC Enterprises, Inc. v. United States,* 163 Ct.Cl. 1, 323 F.2d 874, 876 (1963) (citing *Western Contracting*).

equitable adjustment provision unambiguous, the court stated that the contractor's interpretation permitting overhead and profit would be precluded even if the language were unclear. *Id.* at 725–26. The reason, the court explained, was that the very same contractor had challenged a similar equitable adjustment clause on a separate occasion, where the Government had also interpreted the clause as excluding overhead and profit. *Id.* at 725. Accordingly, the court concluded, the contractor was on notice of the Government's interpretation of the equitable adjustment provision when it entered into the contract at issue, and could not then assert a different interpretation.

Here, unlike *Perry & Wallis,* the subject of the disputed contract provision—the HVAC system—had not yet been designed when the lease was signed. *HPI/GSA–3C,* 2003–1 B.C.A. (CCH) at 158,677. Jackson–Kiley, therefore, could not have understood a "zone" to be an air-handling unit, which is the interpretation to which the Board binds HPI under the *Perry & Wallis* rule. *See id.* at 158,676 (finding that Jackson–Kiley "did not have a conception of the square footage a zone would cover" and that she was "thinking in terms of the equipment . . ., whatever the square footage"). Since Jackson–Kiley did not understand a "zone" to be an air-handling unit, HPI could not have known or had reason to know of that particular interpretation when it entered the lease. Consequently, HPI cannot be bound under the rule articulated in *Perry & Wallis.*

The Board's explanation, however, need not rely on *Perry & Wallis* to reach its result. The Board's opinion explains that Jackson–Kiley "made it clear" that the Government did not want to incur the expense of running the entire HVAC system during overtime hours and that its purpose in including the SFO Amendment was cost savings. *HPI/GSA–3C,* 2003–1 B.C.A. (CCH) at 158,684. While Jackson–Kiley's abstract conception of a "zone" may not support the rule of *Perry & Wallis,* the explanation of her understanding to Wieger could support a variant of that rule sufficient to render HPI's interpretation unreasonable. If, as a consequence of Jackson–Kiley's repeated explanations of the purpose underlying the SFO Amendment, Wieger understood that Jackson–Kiley associated a "zone" with HVAC equipment rather than the 2,000 square foot area described in paragraph 6.6(e), the clear purpose of the GSA and the understanding of that purpose by Wieger defeats the operation of *contra proferentem.*

Wieger's reliance on his interpretation of the term "zone," knowing that Jackson–Kiley's understanding differed, would be neither actual nor reasonable. "The bidder who is on notice of an incipient problem, but neglects to solve it as he is directed to do by this form of contractual preventive-hygiene, cannot rely on the principle that ambiguities in contracts written by the Government are held against the drafter." *Beacon Constr. Co.,* 314 F.2d at 504. While this rule is often announced in the context of a patent ambiguity, we think the reasoning applies equally where a contractor *actually* knew that the Government held an interpretation different than its own. *See id.* ("In this case it is plain that, as we have found, the discrepancy was in actual fact, and in reason must have been, fully known to plaintiff before it computed its bid." (footnote omitted)). Where an ambiguity is not so glaring as to rise to the level of patency, yet the contractor knows or has reason to know that the drafting party, unaware of the contractor's interpretation,[8] holds an interpretation different

---

8. We note also that, as asserted at oral argument, the record contains some support for the possibility that GSA should have been

than its own, the result when that contractor seeks to "bridge the crevasse in his own favor" should be no different than if the ambiguity were patent.[9] *Id.*

Unfortunately, the Board made no findings regarding the extent of Wieger's knowledge of the Government's differing interpretation or, for that matter, regarding the Government's awareness of the inconsistent interpretations among the bidders.[10] Its citation of *Perry & Wallis* and its repeated quotation of Wieger's defensive explanations as to why he avoided discussing his understanding of the term "zone" with Jackson–Kiley, however, suggest to us that the Board viewed Wieger as having some degree of knowledge that his interpretation was at odds with that of the Government and that Wieger did not want to highlight the disagreement. In light of the foregoing discussion, we believe the proper course is to vacate this aspect of the Board's decision and remand it for further evidentiary development. If the Board concludes that the Government was unaware of any ambiguity in the lease documents and that Wieger knew that the Government held an interpretation differ-

ent than his own, the Board may reaffirm its previous conclusion.

■■■ To the extent that the Board finds the evidence insufficient to support a finding of knowledge on the part of Wieger, however, we think the rule of *contra proferentem* must control the outcome. Contrary to the Board's finding, the term here was not negotiated. It was drafted and issued entirely by the Government, with the bidding parties merely filling in the blanks. And, as we have explained, the magnitude of the overtime charges is not sufficient to render HPI's interpretation unreasonable. Inconsistency with the language, the context of negotiations, or the clearly expressed intentions of the parties may render an interpretation unreasonable under the circumstances—adverse consequences, standing alone, may not.

## III. CONCLUSION

Because the Board did not clearly state its reasoning in declaring HPI's interpretation of "zone" unreasonable, we vacate-in-part the Board's decision and remand

aware of variations among the bidders in their understanding of "zone." In GSA's Price Negotiation Memorandum summarizing the best and final offers, the costs for overtime HVAC services per zone quoted by the bidding parties differ significantly, reflecting potential variations in their understandings of the term "zone." These variations are not without impact on the reasonableness of GSA's actions. *See Hunt Constr. Group v. United States*, 281 F.3d 1369, 1374–76 (Fed. Cir.2002) (explaining that the Government may have a duty to notify bidding parties of ambiguities where it has notice of the ambiguity). The Board, however, did not address this point in its opinion and we decline to do so in the first instance.

9. The dissent argues that we should mechanically apply *contra proferentem* because the Government had not yet crystallized its understanding of the contractual language. We

agree with the dissent that to be bound under the rule of *Perry & Wallis*, a party must have known the other party's interpretation and, because that was not possible here, *Perry & Wallis* is inapplicable. The patent ambiguity doctrine, however, requires no actual knowledge of the other party's interpretation, and only imputed recognition of the ambiguity itself. The justifications for an exception to the rule of *contra proferentem* are perhaps even more compelling where a party had actual knowledge of the ambiguity and we are remanding to the Board to determine whether that situation is present here.

10. In finding of fact 16, the Board did note that the bids differed in the way that they quoted overtime HVAC rates. *HPI/GSA–3C,* 2003–1 B.C.A. (CCH) at 158,677. The Board did not explain, however, why these varying responses did not put GSA on notice of the ambiguity.

for further proceedings consistent with this opinion.

*VACATED–IN–PART AND REMANDED*

## IV. COSTS

No costs.

LINN, Circuit Judge, concurring-in-part and dissenting-in-part.

I concur with the majority's affirmance of the Board's determination that the $40 zone charge in the formula contained in the SFO Amendment was intended to be an hourly charge per zone rather than a one-time charge per occurrence, *ante* at 1333; the affirmance of the Board's conclusion that the term "zone" as used in the lease is ambiguous, *id.* at 1334; and the conclusion that the ambiguity is not patent, *id.* at 1334–35. I also concur with the majority's conclusion that, contrary to the Board's opinion, the terms of the SFO Amendment were not negotiated and that the government was wholly responsible for the drafting and issuance of the SFO Amendment. *Id.* at 1337. However, I find no basis to extrapolate and apply a variant of the rule in *Perry & Wallis* to the facts of this case and, therefore, respectfully dissent from that part of the majority opinion. Because *contra proferentum* applies to the interpretation of the zone-based overtime formula in this case, I would reverse the decision of the Board, find for HPI, and remand for determination of an appropriate remedy against the government.

In considering the application of *contra proferentum*, the majority questions whether HPI had knowledge of the government's understanding of "zone" when the contract was formed and whether that knowledge binds HPI to that understanding. The majority looks to *Perry & Wallis* for guidance.

As the majority correctly states, the facts of this case do not fall within *Perry & Wallis,* because at the time the lease was signed, the HVAC system had not yet been designed. At that time, Jackson–Kiley "could not have understood a 'zone' to be an air-handling unit, which is the interpretation to which the Board binds HPI under the *Perry & Wallis* rule." *See ante* at 1335. Because Jackson–Kiley's understanding of the meaning of "zone" was too abstract to support the rule of *Perry & Wallis,* HPI cannot be bound by such an interpretation. *Id.* The majority then articulates a variant of the *Perry & Wallis* rule based on Jackson–Kiley's "repeated explanations of the purpose underlying" the contract term. *Id.* at 1336. It is on this point that I respectfully disagree.

If Jackson–Kiley's understanding of what "zone" meant was simply an abstract concept, as the Board found and the majority accepts, her "repeated explanations of the purpose" could not have given HPI any greater insight into her understanding. While HPI might have speculated any number of things from Jackson–Kiley's explanations of the purpose of the formula, without more, those speculations are just that. HPI cannot be bound by what it speculates the government might be thinking. Moreover, Jackson–Kiley's statements of purpose were not necessarily inconsistent with HPI's interpretation.

To bind a contractor to a government interpretation, there must be some evidence that the government actually had an interpretation contrary to the interpretation of the contractor and that the contractor knew or had reason to know of such contrary interpretation. In *Perry & Wallis,* the same contractor had challenged a similar clause on a separate occasion and was therefore on actual notice of the Government's interpretation of the provision when it entered into the contract at issue.

*Id.* at 1335. The majority extends *Perry & Wallis* to hold contractors responsible not only for contrary interpretations known to be held by the government, but also for contrary interpretations that the government might have.

With all due respect, such an extension is unwarranted. The rule of *Perry & Wallis*, in its truest sense, is a form of estoppel. "A party who willingly and without protest enters into a contract with knowledge of the other party's interpretation of it is *bound* by such interpretation and *cannot later claim* that it thought something else was meant." *Perry & Wallis,* 427 F.2d at 725 (emphasis added). While, in dicta, the *Perry & Wallis* court remarks that it would be unreasonable for a contractor to assert a contrary interpretation, the reason for the unreasonableness is basically estoppel. *Id.* at 726. Here, the majority extends an essentially estoppel-based rule to cover not only an interpretation of which the contractor was aware, but one: (a) that the government had not formed, and (b) that the contractor simply might have speculated from a contracting officer's statements of "purpose." I see no justification for such a variant of the rule of *Perry & Wallis.*

While it is apparent that the amount openly bid by HPI for the zone rate was extremely favorable to it, and while it is not surprising to think that HPI played its bid close to the vest in not wanting to draw attention to the high dollar figures it used, the unfavorable financial consequences of the government's acceptance of those figures is not alone sufficient to find against HPI. On the facts of this case, I believe the doctrine of *contra proferentum* applies and that the government must bear the consequences of the bargain it struck.