# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- | ) |
| | ) |
| Optimization Consulting, Inc. | ) ASBCA No. 58752 |
| | ) |
| Under Contract No. W9133L-10-D-0002 | ) |

APPEARANCE FOR THE APPELLANT: Sheridan England, Esq.
S. L. England, PLLC
Washington, DC

APPEARANCES FOR THE GOVERNMENT: Raymond M. Saunders, Esq.
Army Chief Trial Attorney
Robert B. Neill, Esq.
Trial Attorney

## OPINION BY ADMINISTRATIVE JUDGE SCOTT

Appellant Optimization Consulting, Inc. (OCI) has timely appealed under the Contract Disputes Act, 41 U.S.C. §§ 7101-7109, from the contracting officer's (CO's) denial of its claim under the captioned contract for psychological healthcare and related data management services issued by the National Guard Bureau (NGB) on behalf of the Air National Guard (ANG). OCI seeks reimbursement for increased costs it alleges it incurred when the government did not accept its proposed Management Information System (MIS) or provide a government-furnished MIS. The Board denied the government's motion for summary judgment. *Optimization Consulting, Inc.*, ASBCA No. 58752, 15-1 BCA ¶ 36,106 (*Optimization I*). Thereafter, the Board conducted a one-day hearing on entitlement only (tr. 11). For the reasons set forth below, we deny the appeal.

## FINDINGS OF FACT

### Solicitation and Contract

1. On August 10, 2018 NGB issued commercial item solicitation No. W9133L-10- R-0099 for an indefinite delivery indefinite quantity contract for mental health counseling and associated support services for members of ANG and their families. The acquisition was set aside for service-disabled veteran-owned small businesses. (R4, tab 2 at 1, 9, 41)[1] The Performance Work Statement (PWS)

---

[1] Rule 4 citations are to the consecutively-stamped numbers unless otherwise indicated.

imposed two broad categories of performance obligations, the first concerning psychological health services (PHS) and the second, related records management and reporting (R4, tab 2 at 45-103).

2. The contract and solicitation included Federal Acquisition Regulation (FAR) 52.212-4, CONTRACT TERMS AND CONDITIONS – COMMERCIAL ITEMS (JUNE 2010), which provides that "(c) Changes. Changes in the terms and conditions of this contract may be made only by written agreement of the parties" (R4, tab 1 at 13; tab 2 at 24).

3. With respect to PHS, contractors were expected to staff 89 psychological healthcare subject-matter experts (PHSMEs) at facilities throughout the United States and its territories who would, among other things, oversee and coordinate mental health services; provide a network of mental health clinicians to provide mental health support to service members and their families; and undertake activities to promote psychological wellness (R4, tab 2 at 3, 56, 78-80, 85-88).

4. The second category of performance obligations, records management and reporting, is addressed primarily in PWS Section III.A, "Security and Records Management," which describes the contractor's obligations relating to a "system of records" and an MIS (R4, tab 2 at 94-103).

5. The parties' obligations with respect to the MIS are at the heart of this dispute. The solicitation does not specifically define "MIS" but it refers to the MIS as a data collection mechanism throughout Section III.A. as well as in other PWS provisions, intermingled with discussions about how and what type of information was to be collected, maintained and reported to ANG. (R4, tab 2)

6. The most detailed discussion of the MIS appears in the following subsection of Section III.A:

> a. Management Information System () **(Portions are Optional for award)**
>
> **The ANG is currently investigating a comprehensive multi-layered tracking and data collection system for many ANG personnel functions. _The ANG may/may not elect to utilize the total capability of Contractor's comprehensive MIS system, but expects the offeror to provide and manage hardware necessary to accomplish and effectively communicate as well as track activity of the PHSME program._ The ANG expects any data collected in the provision of this contract will have the ability to be transferred and/or to collaborate in**

2

> **partnership with other ANG/IT contractors, within the**
> **bounds of privacy and confidentiality laws and**
> **regulations. However, the Government does expect**
> **each offeror to propose as part of this solicitation, its**
> **MIS capabilities and plan for tracking PHSME**
> **services.**
>
> Offerors are to propose use of their MIS and describe in
> their proposal how their MIS will effectively support the
> full range of services needed under this contract. Offerors
> are to provide a breakout of MIS costs as part of their
> business proposal. The Government reserves the right to
> require use of a DoD [U.S. Department of Defense] system
> or a combination of DoD and Offeror's MIS.

(R4, tab 2 at 95) (emphasis in original)

7. Section III.A provides additional detail regarding the contractor's obligations with respect to documentation, data management and reporting (R4, tab 2 at 96-101, 103). Among other things, contractors were responsible for "collection and management of all case management, counselor activity, and business management data required to create operational and business reports for the ANG," which was to be "maintained within the Contractor's MIS" (R4, tab 2 at 97).

8. PWS section III.D, "Government Furnished Facilities and Equipment/Property" does not explicitly identify particular items as government furnished property (GFP) including an MIS (R4, tab 2 at 103-11). Rather, it discusses a variety of issues, including that, when requested by the CO's technical representative (COTR), the contractor was "to fully participate in an in-depth study of the security of the Contractor's records system and [MIS]" (R4, tab 2 at 106). The contractor was also to adhere to the requirements of its "MIS security plan including security guidelines for electronic files" (R4, tab 2 at 106). In addition, the MIS was to comply with DoD computer security requirements, including a number of laws, regulations and directives addressing the security of information systems (R4, tab 2 at 107-09; *see also* app. br. at 4-5 (listing contractor's MIS responsibilities)).

9. The solicitation included a table listing 63 "deliverables" consisting essentially of tasks the offerors would be expected to complete as part of contract performance. Those deliverables did not include an MIS. (R4, tab 2 at 88-93)

10. The solicitation included four contract line items (CLINs): CLIN 0001, covering labor costs for 89 PHSMEs and one program manager; CLIN 0002, for additional labor hours worked by PHSMEs outside the normal eight-hour work day

3

(subject to certain time limitations); CLIN 0003, for travel and other direct costs for the program manager; and CLIN 0004, for travel, materials and other direct costs within the 89 operating areas. CLINs 0001 and 0002 were firm fixed price; CLINs 0003 and 0004 were cost CLINs. (R4, tab 2 at 3-4)

11. Pricing proposals were to be evaluated for completeness and accuracy. Offerors were required to "identify Unit Price, extended totals Amounts for CLINs (0001, 0002), and the total proposal amount." (R4, tab 2 at 12)

12. Solicitation Modification No. 0001 (Mod. 1), effective August 19, 2010, contained 40 questions and answers on a variety of issues; several addressed how offerors were to account for various performance costs (R4, tab 3). In response to Question 5, which asked "under what CLIN should we put other direct costs – e.g., support staff for the program manager; costs of office space should that be necessary[,]" potential offerors were advised that "all overhead, G&A, or support costs will be included in the labor rates of CLIN 0001" (R4, tab 3 at 3). Questions 6 and 8-10 requested clarification regarding where offerors should include costs associated with implementation, client satisfaction surveys, and "Transition In" and "Transition Out" activities. All answers referred to the answer to Question 5 (R4, tab 3 at 3-4).

13. Question 13 asked whether the potential offeror was correct in assuming that "costs associated with Contract Administration, Accounting, Reporting, Human Resources, IT support and the like should be included in the burden rates since there is not a separate CLIN for these costs." The government responded that "these G&A support costs should be included in the quoted fully burdened labor rates." Neither Question 13 nor its answer contained any explicit reference to MIS. (R4, tab 3 at 5)

14. Question 14 requested clarification concerning the contract type, noting that the CLINS were identified as both firm fixed price and cost. The government responded:

> [T]he Firm Fixed Price applies to the quoted labor rates. Cost CLIN will not be evaluated and need not be quoted in accordance with the evaluation criteria provided in the solicitation. . . . [U]nit prices and extended CLIN totals need only be provided for CLIN 0001 and 0002. The Cost CLINs are primarily for Travel expenses. . . . No G&A, fees or overhead rates will be applied to CLINs 0003 and 0004.

(R4, tab 3 at 5)

4

15. OCI's proposal[2] stated that it would be teaming with two other companies; the combined organization was called "Team Craft Healthcare" (R4, tab 4 at 2-3; tab 7). With respect to MIS, the proposal stated as follows:

> Team Craft Healthcare has garnered the support of IntelliSuite MIS technicians to fully explore the requirements and resources needed to procure a comprehensive MIS system that meets the ANG's needs. Toward that end, we are prepared to utilize our MIS support infrastructure to enable all users to communicate effectively and to generate data and statistical reports to make projections and support case management.

(R4, tab 4 at 13; tab 7 at 20)

16. In response to specific questions in the solicitation, OCI's proposal detailed various elements and capabilities of its proposed MIS. It also summarized the information that would be provided under the required reports; described the information to be included in the event that data transition were requested or upon contract termination; and included several report examples. (R4, tab 4 at 14-18, 23-25; tab 7 at 20-24, 29-31)

17. OCI proposed a total cost of $21,593,125.88, broken down by price per CLIN, and included an explanation of how the figures for each were calculated (R4, tab 6). With respect to CLIN 0001, the pricing reflected "the costs of training and employing the 89 PHSMEs, the 6 RLPHPs,[3] and the Program Manager for the first year of services" (R4, tab 6 at 4). The explanation did not break out the costs by component.

18. With respect to CLIN 0004, the proposal stated that the figure quoted "reflects all the Wing-level travel and other direct costs," and then described "other direct costs" as consisting of the following:

> Other direct costs will cover the maintenance and operations of Team Craft Healthcare's [MIS]. Team Craft Healthcare has garnered the support of IntelliSuite MIS

---

[2] OCI's technical proposal was submitted on August 25, 2010 and clarifications were submitted on September 10, 2010. The portions of the two submissions relevant to this appeal are identical in all material respects.

[3] RLPHPs are regional lead psychological healthcare providers (R4, tab 7 at 6).

technicians to fully explore the requirements and resources needed to procure a comprehensive MIS system that meets the ANG's needs. Toward that end, we are prepared to utilize our MIS support infrastructure to enable all users to communicate effectively and to generate data and statistical reports to make projections and support case management.

This will cover [various listed cost items].

Other costs will include upgrading or replacing the computers, developing, networking, evaluating and migrating the MIS data, evaluation and assessment materials, supplies, and hosting of the Sharepoint web-base.

(R4, tab 6 at 8-9) OCI priced CLIN 004 at $1,156,329. Of that figure, $550,329 was identified as being for material and other direct costs, including "[d]eveloping networking, [evaluation], and migration of the MIS data." (R4, tab 6 at 8)

19. The source selection authority (SSA) found four proposals to be technically acceptable (R4, tab 8 at 1-3). The SSA evaluated the offerors' prices on the basis of CLINs 0001 and 0002 alone, noting that offerors had been instructed that proposed costs for CLINs 0003 and 0004 were not expected and would not be evaluated. OCI's price was the second lowest. (R4, tab 8 at 3-4)

20. The SSA determined that a nationwide implementation would be too challenging for a single entity and divided the contract between OCI and another offeror (R4, tab 8 at 4). NGB awarded OCI its portion of the contract on September 24, 2010, for a maximum amount of $17,050,000 (R4, tab 1 at 1, 10). Task order No. 0001, in the amount of $4,218,356.20, became effective September 29, 2010; task order No. 0002, in the amount of $1,532,369.52, became effective April 15, 2011; and task order No. 0003, in the amount of $7,692,981.56, became effective September 28, 2011. (R4, tabs 10, 18, 45)

21. The contract's CLINs were substantially the same as the solicitation's CLINs, modified to reflect a reduced number of personnel due to the division of the award between two contractors (R4, tab 1 at 4-7). CLINs 0001 and 0002 were priced at a maximum value of $6 million and $1.5 million respectively, with no reference to the proposed labor rates. CLIN 0004 was priced at a maximum of $450,000, with no reference to any of the costs proposed by OCI for its MIS. (R4, tab 1 at 11; *see also* R4, tab 6 at 8-9) The contract's PWS was identical to the solicitation's PWS in all material respects.

6

## Contract Performance

22. Contract performance was accomplished under the above three task orders, none of which changed the PWS requirements (R4, tabs 10, 18, 45).

23. According to OCI's Chief Executive Officer (CEO), Bryant Holmes, when the government awarded the contract to OCI, it did not accept OCI's proposal to use IntelliSuite, which he characterized as an off-the-shelf product, as its MIS (tr. 22, 28-30, 51; *see* R4, tab 1 at 8). Instead, according to Mr. Holmes, the government assured OCI that it would provide an MIS (tr. 30-31). Mr. Holmes could not identify the person alleged to have stated that the government would provide an MIS (tr. 55).

24. Mr. Holmes was the only witness to testify on OCI's behalf. Before he became OCI's CEO, he was its chief financial officer (CFO) during the relevant period (tr. 23). However, he had no direct involvement in contract performance and no communications with government representatives during performance. He provided no input into OCI's proposal preparation, pricing, or the subject claim. (Tr. 22-23, 45-50, 56-58) We accord little weight to Mr. Holmes' testimony except to the extent that he had personal knowledge that OCI provided MIS services to the government and that the government did not pay all of OCI's invoices. He averred that OCI ultimately ended up going out of business as a result. (Tr. 61)

25. Lt Col David Bringhurst, now retired, was the COTR beginning in October or November 2011. Shortly after he began, an OCI representative informed him that OCI expected the government to provide an MIS. However, when Lt Col Bringhurst questioned government contracting officials about that expectation, he was told that "when we went out for bid . . . there was a separate portion of the bid . . . that was considering [an MIS] that was not included [in] the final bid[.]" Lt Col Bringhurst never promised OCI that the government would provide an MIS. (Tr. 131, 134-36)

26. Because the government did not accept OCI's proposed MIS, OCI performed its data management obligations throughout the life of the contract using an "ad hoc" system in the form of an Excel spreadsheet developed by the NGB and provided to ANG (tr. 30, 81-82, 137-38). ANG passed the spreadsheet on to OCI, which used it to "collate" the required data before providing it to ANG each month (tr. 138-39). Although Lt Col Bringhurst wanted an MIS with real time data, he found the Excel spreadsheets to be sufficient to meet the contract's data reporting requirements, stating that OCI was "meeting the deliverable – you know, we certainly wanted more. . . . [but] it sufficed to have the Excel spreadsheets" (tr. 143).

27. OCI considered the "ad hoc" system to be inefficient and unwieldy, and it contended that the cost to provide the data in this manner was significant. It

7

repeatedly informed the government that an MIS was necessary for it to provide the contract deliverables. (R4, tab 66 at 4; tab 79; tab 82 at 3; tab 131 at 8; tr. 31) At a December 16, 2011 meeting, OCI alleged to ANG that it was using three additional personnel who were "not included, nor billable to the existing contract" to "support the contract full time to account for [the] missing MIS System;" these personnel were spending "80% of their time formulating reports and gathering data that should be automatically compiled by the MIS System;" and this was not cost-efficient and did not "fully alleviate the burden . . . that an MIS solution would solve." (R4, tab 66 at 4)

28. In an "Impact Analysis" dated February 29, 2012[4] marked "URGENT," OCI alleged to ANG that the lack of an MIS was having a debilitating effect upon its ability to perform the contractually required tasks adequately. OCI contended that the solicitation required an MIS but that, upon contract award, it had been notified that its MIS had not been accepted because the government would be locating and implementing its own MIS solution. OCI did not identify who provided the alleged notice and we have not been directed to, and have not located, any such written notification of record. OCI requested a contract modification to "implement an MIS solution immediately as originally required" or to modify the contract's pricing structure to account for its alleged additional costs. (R4, tab 79 at 1) The impact analysis stated:

> Without either modification, all additional resources and personnel outside the contractual provisions must be removed from the worksite and relieved of ANG PHP-related duties as of March 9, 2012. Should this happen, it will have a potentially devastating effect on the Program. . . . [Without] either an MIS or administrative support, the Program becomes completely impossible to manage and operate.

(R4, tab 79 at 1)

29. In a March 7, 2012 email an ANG representative responded to OCI that, under the contract, ANG had reserved the right to elect not to use any particular portion of the contractor's MIS or not to use it at all. The government's decision "to implement for cost or to stay the implementation of the MIS system" did not reduce the contractor's responsibility to provide ANG with the data listed in the contract's deliverables. Moreover, the items detailed in the impact analysis were listed in the contract's statement of work and were already "included in the overhead, G&A and fees currently being assessed in the invoices." (Ex. A-4 at 8)

---

[4] The record includes a version of this document dated February 27, 2012 that is the same as the February 29, 2012 version in all material respects (R4, tabs 78-79).

30. In April 2012, ANG de-obligated funds for task orders Nos. 0001 and 0002 by unilateral modifications, stating that the de-obligated funds were in excess of what OCI had billed and had been paid, and that "there is evidence to support the fact that the required services were provided and the contractor was paid in accordance with the conditions of the contract." (R4, tab 85 at 4; tab 86 at 4)

31. In April or May 2012, OCI began submitting the required data in an uncollated format on approximately 44 individual spreadsheets rather than one consolidated spreadsheet (tr. 138-39). According to Lt Col Bringhurst the data provided in that format was "complete" but not "satisfactory" because it was a "pile of data" that was not manageable in the way he wished it to be (tr. 153-54).

32. On November 27, 2012, the parties met to discuss a number of issues, including the lack of an MIS. By this time, CPT Michael Wade of NGB had been assigned as CO.[5] He served as CO from approximately September 2012 through contract completion in March 2013 and authored the CO's final decision in May 2013. (R4, tabs 131, 213; tr. 158-61) OCI's minutes of the meeting state that CPT Wade informed OCI that, although it was originally the government's intent to provide an MIS, it would not be doing so and "the status quo we currently are using is acceptable up to this point." (R4, tab 131 at 8) OCI's minutes report that CPT Wade stated that the government was not in a position to make any changes because they were at the end of the contract, but he would "take a look at the MIS section of the SOW for future reference" (R4, tab 131 at 8).

33. By letter dated December 26, 2012, OCI submitted a certified claim for a $3,661,683.16 equitable adjustment, covering the period October 2010 through December 2012. OCI alleged increased costs due to the government's failure to implement an MIS in accordance with the contract. (R4, tab 147 at 1, 5) OCI contended that "[t]he "contract expressly and specifically requires an MIS for nationwide data management" (R4, tab 147 at 5). It alleged that, although the government had advised OCI that it would provide an MIS, it never did so, which forced OCI to use a "work-around" system to compile data manually, analyze it, and generate the reports the contract required (R4, tab 147 at 3). This resulted in the need for additional personnel and labor hours beyond what would have been necessary if the reports were automatically generated using an MIS (R4, tab 147 at 3-6). OCI claimed that there was a "direct nexus" between the government's inaction and OCI's additional costs (R4, tab 147 at 4). The claim is based upon the doctrine of constructive change. OCI did not directly allege contract breach or contend that the contract was ambiguous. (*See* R4, tab 147)

---

[5] By the time of the hearing, CPT Wade had been promoted to Major. We refer to him by his rank at the time of the final decision.

9

34. On May 25, 2013 CPT Wade issued his final decision denying OCI's claim (R4, tab 213). Among several other things, he noted that OCI had included its costs relating to information technology, including MIS, in CLIN 0004, even though in Mod. 1 the government had informed offerors that costs proposed under CLINs 0003 and 0004, which were intended for travel costs, would not be included in the proposal evaluations. He opined that, regardless of whether the government indicated an intent to obtain its own MIS, which was not supported by the contract file or any evidence provided with the claim, the contract required that changes be made only by the parties' written agreement (R4, tab 213 at 4).

35. CPT Wade also asserted that the government did not represent, in the solicitation or contract, that it would provide an MIS as GFP, and he described the MIS as an "optional component" of the contract effort (R4, tab 213 at 4-5). He further cited a number of alleged problems with OCI's invoicing, including that it rarely invoiced for more than a small number of hours under CLIN 0002, where overtime hours were to be invoiced, and that its invoices did not reflect that personnel were working beyond the standard work week. He noted that OCI never sought authorization to exceed the maximum amount of overtime identified in CLIN 0002 and contended that OCI's claimed costs were based upon unsupported estimates and unverifiable alleged additional work hours. (R4, tab 213 at 5-6)

### Testimony Concerning the Contract's MIS Requirement

36. Lt Col James Coker served as a CO's representative on the contract. He assisted in drafting the PWS, which was based upon language borrowed from a separate contract for the provision of similar services to other National Guard personnel. The borrowed language was then "tailored" for ANG. (Tr. 75-76) Although Lt Col Coker conceded that portions of PWS Section III.A contemplated that a contractor should provide a comprehensive MIS or include an MIS in its proposal, he asserted that the contract did not require an MIS (tr. 90-92).

37. CPT Wade's understanding from ANG personnel was that, contrary to the PWS statement, ANG was not "investigating a comprehensive multi-layered tracking and data collection system" at the time of contract award. That language was copied from an Army Guard document, as was the language that ANG "may or may not elect to utilize the total capability of the contractor's comprehensive MIS system." (Tr. 182-84)

### THE PARTIES' CONTENTIONS

In Count I of its complaint, OCI alleged that the government breached the parties' contract when it failed to provide an MIS or to use the MIS proposed by OCI.

10

In Count II, OCI alleged that, by rejecting its MIS and informing OCI that it would use its own, the government constructively changed the contract, requiring the government to provide the MIS, which it failed to do. In Count III, OCI alleged that the solicitation contained a latent ambiguity with respect to responsibility for the MIS.

The government denied OCI's allegations and moved for summary judgment on the ground that the contract did not require it either to pay OCI for its MIS or to provide one for OCI's use. The government alleged that the contract unambiguously stated that an MIS tool was an optional service and optional for award. The Board determined that the contract "does not unambiguously support the government's interpretation" *Optimization I*, 15-1 BCA ¶ 36,106 at 176,275, and concluded that, based upon Section III.A, an MIS was not optional. *Id.* at 176,276. The contractor was expected to use its own MIS unless the government provided one. *Id.* OCI did not move for summary judgment and the Board did not reach the issue of whether OCI's interpretation was supported by the contract. *Id.* at 176,277.

In its principal post-hearing brief OCI first asserts that:

> This case turns on one simple fact: whether [the subject contract] required OCI to provide [an MIS]. The hearing, much like the plain language of the Contract, established that it did. Accordingly, OCI is entitled to judgment.

(App. br. at 1) OCI later contends that the contract "conclusively provided for the use of an MIS while leaving the source of said MIS undetermined" (*id.* at 5) (emphasis omitted). OCI asserts that the contract, read as a whole, "confirms that the MIS permeates the entire contract and is essential to the effective execution of the contract" (*id.* at 4), and that an MIS was a material contract requirement (*id.* at 5). OCI concludes that, if there were any ambiguity, it was latent; its interpretation was reasonable; the doctrine of *contra proferentem* applies; and the contract must be construed against the government (*id.* at 6-7). OCI does not directly allege breach or mention constructive change.

The government responds that there was no government contract breach, constructive change, or relevant contract ambiguity (gov't br. at 1). While it did not provide an MIS for OCI's use, the contract did not obligate it to do so. Rather, the contract unambiguously required OCI to collect and maintain data and provide reports to the government. OCI was on notice prior to contract award, through the questions and answers published in Mod. 1, to include its anticipated costs of meeting the contract requirements, including "any MIS it chose to employ" in its fully burdened labor rates under CLIN 0001, which resolved any possible ambiguity concerning responsibility for those costs. (*Id.* at 1-3)

11

The government contends that the contractor's employment of an MIS was not a material contract requirement but, if it were considered to be so, then OCI's failure to use an MIS was a prior material breach excusing the government from any MIS payment obligations. The government acknowledges that it accepted OCI's submission of the required data through Excel spreadsheets, and permitted OCI to continue contract performance. (Gov't br. at 3) The government assesses that "responsibility for [OCI's] costs to track and manage data to be provided via reports to the ANG appears to be the actual issue in this appeal" (*id.* at 18). It contends that because OCI did not use an MIS, it incurred no MIS costs and it has been fully compensated in accordance with the contract for its overhead costs, including data collection, analysis and reporting (*id.* at 3). The government asserts that, to the extent OCI failed to include all such costs in its proposed pricing for firm fixed-price CLIN 0001, it bore the risk of its own oversight and any increased costs (*id.* at 21).

OCI replies that the government mistakenly conflates the contract's MIS requirements and data management. It asserts that an MIS was a separate required contract deliverable. (App. reply br. at 1) OCI also challenges the government's assertion that the questions and answers in Mod. 1 resolve the issue, stating that "IT support, generally, is not the same as MIS services" (*id.* at 5). OCI disputes the government's contentions that it did not provide an MIS and/or did not bill under the correct CLIN 0001 (*id.* at 3-4). OCI alleges that the issues raised by the government are both belated and matters of quantum, not liability. The thrust of OCI's allegations is that it "provided *ad hoc* MIS services at considerable expense because the government refused to furnish its own MIS and further refused OCI's offers for other off the shelf solutions" (*id.* at 3).

## DISCUSSION

We have considered all of the parties' arguments but discuss only those important to our decision.

### The Contract Was Not Ambiguous Concerning Contractor's MIS Responsibilities

OCI alleges that its interpretation of the contract must prevail because the contract was latently ambiguous, such that the rule of *contra proferentem* applies and the contract must be construed against the government as its drafter. It is fundamental that, when interpreting a contract, we begin with the language of the written agreement, consider the document as a whole, and interpret it "so as to harmonize and give reasonable meaning to all of its parts." *NVT Technologies, Inc. v. U.S.*, 370 F.3d 1153, 1159 (Fed. Cir. 2004) (citing *McAbee Constr., Inc. v. U.S.*, 97 F.3d 1431, 1435 (Fed.Cir.1996)). "An interpretation that gives meaning to all parts of the contract is to be preferred over one that leaves a portion of the contract useless, inexplicable, void,

12

or superfluous." *NVT Technologies, Inc.*, 370 F.3d at 1159 (citing *Gould, Inc. v. U.S.*, 935 F.2d 1271, 1274 (Fed. Cir. 1991)).

A contract is considered to be ambiguous "if it is susceptible of two different and reasonable interpretations, each of which is found to be consistent with the contract language." *Community Heating & Plumbing Co., Inc. v. Kelso*, 987 F.2d 1575, 1579 (Fed. Cir. 1993) (citations omitted). It is not enough to show that "the parties differ in their respective interpretations of a contract term. . . . Rather, both interpretations must fall within a 'zone of reasonableness.'" *Metric Constructors, Inc. v. National Aeronautic and Space Administration*, 169 F.3d 747, 751 (Fed. Cir. 1999) (citations omitted). A patent ambiguity is one that is so "'obvious, gross, [or] glaring'" that it triggers a bidder's duty to inquire. *NVT Technologies, Inc.*, 370 F.3d at 1162 (citation omitted). If an ambiguity is not sufficiently glaring to trigger the patent ambiguity exception, it is deemed latent and the general rule of *contra proferentem* applies. *HPI/GSA-3C, LLC v. Perry*, 364 F.3d 1327, 1334 (Fed. Cir. 2004). Even if an ambiguity is latent, however, the nondrafting party must prove that it relied on its interpretation during bidding. *Fruin-Colnon Corp. v. United States*, 912 F.2d 1426, 1430 (Fed. Cir. 1990).

Under the solicitation and resulting contract, which were substantially the same in all material respects (*see* finding 21), offerors were to propose use of their MIS and describe how it would support the full range of contract-required services. They were to break out MIS costs as part of their proposal. While portions of the MIS were optional for award, and the government reserved the right to require use of a DoD system or a combination of DoD's and the offeror's MIS, nothing in the contract obligated DoD to provide an MIS. The contract clearly provided that the contractor had the ultimate responsibility to supply and employ an MIS (findings 4-8).

The government's contention that the answers to questions in Mod. 1 unambiguously directed offerors to include their direct and indirect costs for reporting and for IT support in their proposed fully burdened labor rates under fixed price CLIN 0001 is reasonable. Other than to allege that MIS and IT support costs are not the same, OCI has not advocated for its own interpretation of where MIS costs were to be included in its proposal. Regardless of the government's directions, OCI recorded those costs under CLIN 0004, a choice it did not explain and which we find to be unreasonable given that the contract documents explicitly stated that CLINs 0003 and 0004 were for travel costs; offerors should not propose any costs for those CLINs; and the government would not be evaluating proposals on the basis of those two CLINs (findings 10, 12-14).

For the foregoing reasons, the contract is not ambiguous and we therefore do not reach the issue of alleged latent ambiguity.

## The Government Did Not Constructively Change the Contract

OCI alleges that the government is liable to it under the doctrine of constructive change. We recently addressed that doctrine:

> "A constructive change occurs when a contractor performs work beyond the contract requirements, without a formal order under the Changes clause, due either to an express or implied informal order from an authorized government official or to government fault." *Circle, LLC*, ASBCA No. 58575, 15-1 BCA ¶ 36,025 at 175,974 (citing *Bell/Heery v. United States*, 739 F.3d 1324, 1335 (Fed. Cir. 2014)). Thus in the absence of government action or fault, the constructive change doctrine cannot form the basis for recovery. *Int'l Data Prods. Corp. v. United States*, 492 F.3d 1317, 1325 (Fed. Cir. 2007).

*Parwan Group Company*, ASBCA No. 60657, 18-1 BCA ¶ 37,082 at 180,498. To recover under a constructive change theory, the contractor must prove not only that it performed additional work beyond the contract's requirements but also that it incurred increased costs over what it otherwise would have incurred in performing those requirements. *Charles F. Day & Assocs. LLC, ASBCA No. 60211 et al.*, 19-1 BCA ¶ 37,215 at 181,175.

Preliminarily, the contract requires that all changes to it can be made only by the parties' written agreement (finding 2). There is no such written agreement concerning the contract's MIS provisions. OCI has not proffered any evidence that any government official with authority constructively changed the contract. OCI's only hearing witness was not actively involved with the contract, proposal preparation or pricing and his testimony in this regard carries little weight. In any event, he could not identify the government employee who purportedly advised OCI that the government would supply an MIS for OCI's use. The government denies this allegation and the Board found no evidence of record of any such instruction. (Findings 23-25, 28) OCI has not met its burden to prove that the government constructively changed the contract.

## The Government Did Not Breach the Contract

OCI alleged in its complaint that the government breached the parties' contract when it failed to provide OCI with an MIS or to use the MIS proposed by OCI (*see also* findings 23, 28). We discussed above that nothing in the contract required the government to provide OCI with an MIS; the government denied that it promised to do so; and OCI did not identify any individual who allegedly made that promise. The

record lacks probative evidence as to why the government did not accept its MIS. OCI failed to meet its burden to prove that the government breached the contract. In sum, OCI has not met its burden to prove entitlement under any of its legal theories.

DECISION

We deny the appeal.

Dated: August 20, 2019

CHERYL L. SCOTT
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

JOHN J. THRASHER
Administrative Judge
Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 58752, Appeal of Optimization Consulting, Inc., rendered in conformance with the Board's Charter.

Dated:

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals

15